Filed 8/7/20
*See dissenting opinion*

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PEDRO JORGE CARDENAS,<br><br>        Defendant and Appellant. | E070624<br><br>(Super.Ct.No. RIF1601208)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Mac R. Fisher and Charles J. Koosed, Judges.  Affirmed in part, vacated in part, and remanded with directions.

Mary Woodward Wells, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, Collette Cavalier and Tami F. Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

1

This appeal involves a brief encounter between two groups of strangers in a restaurant parking lot at closing time, in which quickly escalating tensions resulted in a shooting. One man was killed, and three others were injured.

Pedro Jorge Cardenas was one of the shooters. He was convicted by jury trial on one count of murder, two counts of attempted murder, and one count of assault with a firearm, and he pled guilty to one count of being a felon in possession of a firearm.

The trial court instructed the jury on the kill zone theory as to the attempted murder counts. We conclude that the evidence was insufficient to justify instructing on the kill zone theory under *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*), and the error was prejudicial. We therefore vacate the attempted murder convictions.

On the felon in possession count, Cardenas argues that his rights under *People v. Arbuckle* (1978) 22 Cal.3d 749 (*Arbuckle*) were violated because he was sentenced by a different judge from the one who took his guilty plea. Cardenas did not object on that basis at sentencing, but he cites *People v. Bueno* (2019) 32 Cal.App.5th 342 (*Bueno*) for the proposition that he did not thereby forfeit the issue. We disagree with *Bueno* and hold that Cardenas forfeited the *Arbuckle* issue by failing to raise it at sentencing.

Apart from correcting certain clerical errors in the abstract of judgment, we otherwise affirm.

BACKGROUND[1]

In two separate trials (one following an initial mistrial on the murder count), juries convicted Cardenas of one count of second degree murder of victim Armando H. (Pen. Code,[2] § 187, subd. (a); count 1), two counts of premeditated attempted murder of victims Christopher (Chris) H. and Juan R. (§§ 187, subd. (a), 664; counts 2 & 3), and one count of assault with a semiautomatic firearm (§ 245, subd. (b); count 4).[3] Before the first trial, Cardenas pled guilty to being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 5). In addition, firearm enhancement allegations for the murder count and one of the attempted murder counts (count 3) were found true, as was a personal infliction of great bodily injury enhancement for the assault count. (§§ 12022.53, subd. (d), 12022.7, subd. (a).) Cardenas received a total sentence of 12 years eight months plus 79 years to life.

A. *Prosecution's Case*

On the evening of February 27, 2016, Armando, four of his nephews (including Chris and Jesse H.), Armando's father-in-law (Juan), and several others were drinking beer and listening to live music at a restaurant and bar. The group stayed until closing

---

[1]    We take these facts from the first jury trial in early 2017. Cardenas does not raise any issues from the second trial at which he was convicted of second degree murder.

[2]    Unlabeled statutory references are to the Penal Code.

[3]    We refer to the victims and their associates by their first names, with or without last initials, to preserve the victims' anonymity. (Cal. Rules of Court, rule 8.90(b).) No disrespect is intended.

time and left minutes before 2:00 a.m. the following morning. Everyone exited together and headed into the parking lot. Armando, Chris, and Jesse were among the first to exit the restaurant; Juan was the last to leave.

Video recordings from two different locations in the parking lot captured what happened there. Those recordings were introduced and played for the jury. Our description of how the incident transpired is based primarily on our viewing of those recordings. Cardenas identified himself and Luis in the recordings.

In the parking lot, Chris and Jesse both noticed two men, later identified as Cardenas and Luis, whom they did not know or recognize, walking toward them in an aggressive manner.[4] When the two groups encountered one another, a verbal altercation ensued. Luis was the initiator and said something like "'what's up'" in an argumentative and aggressive manner. Jesse and Armando both responded in kind. Armando said in Spanish, "Que onda, pendejo," which Jesse explained roughly translates as "what's up, asshole."

At that point, the parties were in the following relative positions, from Cardenas's perspective: In front of Cardenas and Luis were three empty parking spots, bounded by an SUV parked in a spot to Cardenas's right and a sedan parked in a spot to Cardenas's left. To the right of the SUV was another empty spot and then a third parked car. Armando and his companions were in the empty spots between the SUV and the sedan, with Armando standing directly in front of Cardenas and Luis. Chris and Jesse were

---

[4] Luis or Luison was identified by Cardenas by his first name only.

4

close to Armando but slightly behind him and to Cardenas's right. The other members of Armando's group were standing loosely behind Armando, Chris, and Jesse, close to the SUV. Armando was standing roughly 15 feet away from Luis, who was slightly closer than Cardenas.

Armando, Chris, and Jesse advanced toward Luis and Cardenas. Armando raised his arms outward and held his palms open. Chris described this stance as Armando being in "fighting form" but not "like he was going to punch somebody," because his palms remained open. Cardenas, whose nickname is Spanky, responded, "'What's up? This is Spanky.'" No one in Armando's group was armed with any kind of weapon.

Luis was holding a gun at his side, pointing it toward the ground.[5] Cardenas pulled a gun out from his waistband. As soon as Chris noticed Cardenas's gun (he had not noticed Luis's), Chris started to back away toward the SUV to take cover. Jesse also backed away from Cardenas and Luis toward the SUV, which is where everyone else headed except Armando and Juan. Armando did not move. Juan had exited the restaurant only moments earlier (six seconds before the shooting began) and was coming around the far end of the sedan (i.e., the end of the sedan further from Cardenas).

Just seconds after pulling out his gun, Cardenas began shooting without warning. Cardenas aimed directly at Armando. After Cardenas fired the first shot, Armando doubled over but remained standing. Armando turned to the side and started to move

---

[5]     It is not clear when Luis pulled out his gun, but it was not visible when the groups encountered one another.

toward the nearby SUV.  As Armando turned, Cardenas fired a second shot, and Luis fired a shot too, also appearing to aim at Armando.  One second transpired between the first and third shots.

At that one second mark, Juan turned to take cover behind the sedan.  He appears to have been hit immediately by a bullet on his left leg or foot.  Juan picked up that foot and started hopping and limping toward the sedan, which he ducked behind.

When Armando turned toward the SUV immediately after the first shot was fired, Luis and Cardenas simultaneously began retreating.  At first both men were walking backward and continued to shoot in Armando's direction.  The second shot from Cardenas and the first shot from Luis were taken during their initial steps backward.

After Cardenas fired the third shot, as Armando and his companions retreated toward the far end of the SUV, Cardenas turned and started running to his right, putting the SUV, the fourth empty spot, and the third car between himself and Armando's group. Luis turned and ran too, following Cardenas around the SUV, the fourth empty spot, and the third car.  Both men fired several additional shots while running away, with the SUV and the third car separating them from Armando and his group.

After rounding the near end of the third car, Cardenas and Luis turned left and fled.  The path of their flight took them past the far end of the third car and then past the corner of the restaurant building, out of view of the video cameras.  For at most one or two seconds, when Cardenas and Luis had passed the far end of the third car but had not yet passed the corner of the building, there were no obstructions separating them from

6

most of the members of Armando's group, who were huddled behind the SUV. But the videos show that by then Cardenas and Luis were no longer firing.

The entire incident—from the initial encounter to Cardenas's and Luis's flight from the scene—lasted 30 seconds. Less than 10 seconds transpired between the first shot and Luis's departure from the parking lot.

Armando was shot six times—once in the right chest, once in the abdomen, and four times in the left leg. He died later that morning. Juan was shot in the foot. Chris was shot on the back side of his right ankle above the Achilles tendon. He was not sure when he was shot. A glass window in the restaurant was shattered, and a man inside was struck in the back by at least one bullet.

Detectives collected 15 shell casings from the scene—seven from a nine-millimeter semiautomatic handgun and eight from a .38 Super semiautomatic handgun. One casing was found approximately 40 feet from the site of the initial encounter; the remainder were closer.

B. *Cardenas's Testimony*

Cardenas testified on his own behalf. He and Luis had been waiting in their car for a companion to return from the restaurant, and they eventually decided to approach the restaurant on foot in order to find her. Cardenas had a loaded nine-millimeter handgun stored in the trunk of the car, and he put it in his waistband before heading toward the restaurant. He brought the gun with him "just in case" because he and Luis

had been involved in a shooting in the same parking lot two weeks earlier.  Cardenas knew that Luis also was carrying a loaded gun, a ".38 Super."

Some of the people in Armando's group responded by "going off" after Luis pulled out his gun and said that they did not care that Luis had a gun.  Cardenas pulled his gun out from his waistband because being surrounded by so many people caused him to fear for his life.  Chris was standing closest to Cardenas.  Cardenas heard "someone clock [*sic*] their gun" but did not see a gun.  Some of the other men, including Armando, may have been armed or had unspecified objects in their hands, which could have been weapons, but Cardenas was not certain.

Cardenas fired the first shot at Armando because he thought Armando was going to kill him.  Cardenas thought Armando might have had a concealed weapon.  Cardenas aimed directly at Armando when he fired the first two shots and continued to shoot in Armando's direction when he ran away because he wanted to hit Armando.

Cardenas acknowledged that after the first two shots he was firing at people who were running for cover, but he could not say specifically whom he was targeting.  He described the people whom he was targeting during his retreat as "the people [who] were coming towards [him]."

8

A. *Kill Zone Jury Instruction*

Cardenas contends that there was not sufficient evidence to warrant instructing the jury on the kill zone theory for the attempted murder counts and that giving the instruction amounted to prejudicial error. We agree.

1. Canizales *and the Kill Zone Theory*

The trial court instructed the jury on attempted murder with CALCRIM No. 600, stating that one of the ways in which Cardenas could be found guilty of attempted murder was if he created a kill zone and intended to kill everyone within that zone as a means of killing Armando.[6] The jury also was instructed that it could find Cardenas guilty of attempted murder if he intended to kill Chris and Juan specifically or as an aider and abettor to Luis. In closing argument, the prosecutor argued that Cardenas was guilty of attempted murder under the kill zone theory and as an aider abettor. The prosecutor did not otherwise argue that Cardenas possessed the requisite specific intent to kill Chris and Juan.

---

[6] The jury was instructed that the prosecution had to prove two elements to prove attempted murder: "1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person." The jury was instructed as follows concerning the kill zone theory: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of [Juan] or [Chris], the People must prove that the defendant not only intended to kill [Armando] but also . . . intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to . . . kill [Armando] by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [Juan] or [Chris]."

The elements of attempted murder are "specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) "When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*Canizales*, *supra*, 7 Cal.5th at p. 602.) But consistent with those requirements, the kill zone theory, which was first approved by the Supreme Court in *People v. Bland* (2002) 28 Cal.4th 313, 327, 330 (*Bland*), "yields a way in which a defendant can be guilty of the attempted murder of victims who were not the defendant's 'primary target.'" (*People v. McCloud* (2012) 211 Cal.App.4th 788, 797 (*McCloud*).)

The Supreme Court recently reexamined the kill zone theory in *Canizales* with the express goal of "more clearly defining" the theory. (*Canizales*, *supra*, 7 Cal.5th at p. 606; *id.* at p. 607.) To that end, *Canizales* held "that the kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of

10

harm." (*Canizales*, at p. 607.) "Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Ibid.*)

*Canizales* instructed that "[i]n determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target." (*Canizales*, *supra*, 7 Cal.5th at p. 607.) This determination "does not turn on the effectiveness or ineffectiveness of the defendant's chosen method of attack." (*Id.* at p. 611.) "Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Id.* at p. 607.)

Further emphasizing the point that the kill zone theory applies only if the defendant specifically intends to kill a primary target by killing everyone in the primary target's vicinity, *Canizales* quoted with approval the description of the theory in *People v. Medina* (2019) 33 Cal.App.5th 146, 156 (*Medina*): The kill zone theory does not apply when "'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In

11

the absence of such evidence, the kill zone instruction should not be given.'" (*Canizales*, *supra*, 7 Cal.5th at p. 607, quoting *Medina*, *supra*, at p. 156.)

Given the strict requirements of the kill zone theory—the defendant must have *specifically intended to kill everyone* in the area around the primary target as a means of killing the primary target—and given that the instruction should only be given if the evidence would support a jury finding that the *only reasonable inference* is that the defendant intended to create a kill zone, *Canizales* predicted that there should "be relatively few cases in which the theory will be applicable and an instruction appropriate." (*Canizales*, *supra*, 7 Cal.5th at p. 608.) The Court further cautioned "that trial courts must be extremely careful in determining when to permit the jury to rely upon the kill zone theory." (*Id.* at p. 597; *id.* at p. 608 ["Trial courts should tread carefully when the prosecution proposes to rely on such a theory . . ."].) And the Supreme Court has repeatedly explained that a kill zone instruction is never required. (*People v. Stone* (2009) 46 Cal.4th 131, 137; *People v. Smith* (2005) 37 Cal.4th 733, 746 (*Smith*); *Bland*, *supra*, 28 Cal.4th at p. 331, fn. 6.)

Turning to the facts before it in *Canizales*, the Supreme Court concluded that there was not sufficient evidence to warrant giving the kill zone instruction. (*Canizales*, *supra*, 7 Cal.5th at pp. 609-611.) There, the two defendants fired handguns at two rival gang members attending an outdoor block party. (*Id.* at p. 599.) One of the defendants fired five shots from a nine-millimeter handgun at the primary target from 100 to 160 feet away on a "wide city street" with easy escape routes. (*Id.* at p. 611.) The primary target

fled down the street in the opposite direction after the first shot, which is when "the bullets were 'going everywhere.'" (*Ibid.*) No one was struck by a bullet. (*Ibid.*) The Court concluded that "the evidence . . . was not sufficient to support a reasonable inference that [the] defendants intended to create a zone of fatal harm around a primary target." (*Id.* at p. 610.)

2. *Insufficient Evidence to Support Giving the Kill Zone Instruction*

We too conclude that there was not sufficient evidence here to support a jury determination that the only reasonable inference from the circumstances of the attack was that Cardenas intended to create a zone of fatal harm as a means of killing Armando.

The record contains substantial evidence from which the jury could infer that Armando was Cardenas's primary target in the shooting (*Canizales*, *supra*, 7 Cal.5th at p. 609), and no one disputes this. For the first two shots that Cardenas fired within the first second, Cardenas pointed the gun directly at Armando (or in his direction) from 15 feet away. Although the groups of men were strangers and had no history with each other, Armando was leading the group of men that was advancing toward Luis and Cardenas during the brief verbal confrontation. Armando was the most vocal person from his group during that encounter. Armando also was holding his arms up in what one of his nephews described as "fighting form." The remaining shots were fired toward the location where Armando sought shelter by the SUV. That is sufficient evidence that Armando was Cardenas's primary target.

To justify instructing on the kill zone theory, however, the evidence must show more than the existence of a primary target. (*Canizales*, *supra*, 7 Cal.5th at p. 609.) There also must be sufficient evidence "to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm" as a means of killing that primary target. (*Id.* at p. 608.) That is not present here.

This 10-second shooting occurred in two distinct phases, which we analyze separately. The first phase occurred in the first second of the shooting. During that phase, Armando was standing 15 feet directly in front of Cardenas and Luis. Armando did not move to seek cover when either Luis or Cardenas pulled out their handguns. Cardenas pointed the gun directly at Armando and fired his first two shots. No one else was standing next to Armando when those shots were fired. Chris and Jesse were behind and to the side of Armando and started to move toward the SUV for cover when they saw Cardenas's gun—by the time the first shots were fired, Chris and Jesse appeared (on the video) to be at least five feet to Armando's left. Juan was the only person who was not already seeking cover behind any parked car. Juan was struck by a bullet within that first second. However, when he was struck, Juan was standing at least one car's length behind Armando, having just walked past the far end of the sedan and emerged from behind it. In fact, Armando was standing directly in between Juan and the shooters. With the targets and the shooters standing in that formation, killing Juan could not have been a means of killing Armando. Nor did the manner in which Cardenas fired his gun have any

14

tendency to show that he was attempting to create a zone of fatal harm around Armando. Cardenas did not sweep his arm from side to side or spray the area with bullets. Instead, he pointed the gun in the direction of his target, Armando, and fired two shots from close range. There therefore was not sufficient evidence from which a jury could conclude that even *a* reasonable inference—let alone the *only* reasonable inference—was that during this first phase of the attack, Cardenas intended to create a kill zone in order to kill Armando.

The same holds true for the second phase of the attack, which started when Armando moved toward the SUV to seek cover with the other men standing there. Cardenas and Luis simultaneously started their retreat out of the parking lot. During the first phase of the attack, there were no objects separating the shooters from Armando and most of his companions. A few of the men were partially obstructed because they were already behind the SUV, but the rest were, like Armando, completely unprotected. Also, when the shooting started, the distance between Armando's companions and the shooters was not much greater than the distance between Armando and the shooters. Thus, had Cardenas stayed where he was when he started shooting, he would have had an unobstructed and short line of fire at both Armando and (most of) the other men.

But Cardenas did not stay where he was. Instead, he retreated along a route that created two obstructions, putting the SUV and the third car between him and Armando's group. Cardenas's retreat also took him farther away from Armando's group—one shell casing was found 40 feet away from where the group took shelter by the SUV. Because

15

Juan sought cover behind the sedan, Cardenas's retreat took Cardenas even farther away from Juan than from the rest of the group.**7** Thus, during the second phase of the shooting, Cardenas's retreat caused his line of fire at Armando and the group of men to become obstructed and longer. (As noted previously, for at most one or two seconds at the end of Cardenas's and Luis's flight from the parking lot there were no obstructions separating them from most of Armando's group, but Cardenas and Luis were no longer firing at that point.) Having repeatedly viewed both video recordings of the shooting, we do not see how a jury could reasonably infer that Cardenas specifically intended to kill everyone around Armando as a means of killing Armando. Moreover, there are numerous alternative reasonable inferences, such as that Cardenas's intention in continuing to fire while retreating was just to facilitate his escape, or to frighten Armando's companions. In sum, as with the first phase of the attack, the record does not contain sufficient evidence from which a jury could conclude that even *a* reasonable inference—let alone the *only* reasonable inference—was that during the second phase of the attack Cardenas intended to create a kill zone in order to kill Armando.

---

**7**    To repeat the relative positions of the parties and vehicles: From Cardenas's perspective when the shooting began, Armando was standing straight ahead in the three empty parking spots, the sedan was parked to Cardenas's left, and the SUV was parked to Cardenas's right, followed by a fourth empty spot and then the third car. Juan emerged from behind the sedan just before the shooting began, and he was immediately wounded and retreated behind the sedan. After the first two shots, Cardenas retreated to his right, around the SUV, the fourth empty spot, and the third car, while Armando and his companions took shelter behind the SUV and Juan remained behind the sedan.

The analysis does not change if the two phases of the attack are aggregated and considered together. Cardenas and Luis initially fired directly at Armando from point blank range and then fled, placing two vehicles and additional distance between themselves and Armando's group while firing additional shots as they ran. For all of the reasons already discussed, the episode considered as a whole cannot support a reasonable inference that Cardenas intended to create a kill zone in order to kill Armando.

To be sure, Cardenas's conduct subjected everyone near and around Armando "'to lethal risk.'" But that is not enough to warrant a kill zone instruction. (*Canizales*, *supra*, 7 Cal.5th at p. 607; *Medina*, *supra*, 33 Cal.App.5th at p. 156.)

The People contend that the circumstances of the attack here constituted a kill zone because the circumstances differ "from *Canizales* in nearly every one of the pertinent circumstances identified by the California Supreme Court"—namely, closer proximity, more combined bullets fired by Cardenas and Luis, and the purported lack of an "easy escape" route. We are not persuaded. The existence of factual distinctions between this case and *Canizales* is not sufficient to show that the kill zone instruction was warranted here. For the reasons we have already explained, the evidence in this case does not support a reasonable inference that Cardenas specifically intended to kill everyone around Armando as a means of killing Armando.

We are similarly unpersuaded by the People's reliance on a post-*Canizales* decision of the Court of Appeal, *People v. Cerda* (2020) 45 Cal.App.5th 1, review

granted May 13, 2020, S260915 (*Cerda*).  The People fail to argue that there are any material factual similarities between the instant case and *Cerda*, and we see none.

In sum, whether the two phases of the attack are considered separately or together, the evidence does not support a reasonable inference that Cardenas specifically intended to kill Armando by killing everyone in the area in which Armando was located.  The trial court therefore erred by instructing the jury on the kill zone theory.

3.  *Prejudicial Error to Instruct on the Kill Zone Theory*

Because the evidence was not sufficient to justify instructing the jury on the kill zone theory and the jury was instructed on a legally inadequate theory, the trial court erred by giving the instruction.  That error requires reversal unless it was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).[8]  (*Canizales*, *supra*, 7 Cal.5th at p. 614; *Aledamat*, *supra*, 8 Cal.5th at p. 13.) We conclude that it was not harmless beyond a reasonable doubt.

Under *Chapman*, *supra*, 386 U.S. 18, error is harmless if the record shows "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Id*. at p. 24.)  In other words, we must determine "'whether it is clear beyond

---

[8]    We agree with the parties that the *Chapman* harmlessness standard applies to Cardenas's claim of error.  As we describe below, the instruction here was identical to that given in *Canizales*, and the prosecutor's argument was similarly misleading. (*Canizales*, *supra*, 7 Cal.5th at p. 613.)  Therefore, as in *Canizales*, "there is a '"reasonable likelihood"' that the jury understood the kill zone theory in a legally impermissible manner." (*Ibid.*)  When the jury is instructed on a legally inadequate theory, the *Chapman* standard applies.  (*People v. Aledamat* (2019) 8 Cal.5th 1, 13 (*Aledamat*); *In re Rayford* (2020) 50 Cal.App.5th 754, 781-783.)

a reasonable doubt that a rational jury would have rendered the same verdict absent the error.'" (*Canizales*, *supra*, 7 Cal. 5th at p. 615.) Reversal is required if there is "'a reasonable possibility'" that the error may have contributed to the verdict. (*Chapman*, at p. 24.)

We cannot say beyond a reasonable doubt that the jury would have reached the same verdict on the attempted murder counts absent the instructional error. The evidence was sufficient to support a finding that Cardenas specifically intended to kill Chris and Juan, but it was not overwhelming, particularly as to Juan. Cardenas fired a gun in the direction of both men. (*Smith*, *supra*, 37 Cal.4th at p. 742 ["the very act of firing a weapon '"in a manner that could have inflicted a mortal wound had the bullet been on target"' is sufficient to support an inference of intent to kill"].) In addition, Chris was near Armando during the verbal confrontation until he moved away upon seeing the guns, and he initially advanced toward Luis and Cardenas along with Armando. From that evidence, the jury could have reasonably inferred that Cardenas possessed the requisite specific intent to kill Chris and Juan. But there also was evidence from which a jury could have reasonably inferred that Cardenas intended to kill only Armando—Cardenas fired directly at Armando from close range and then, while fleeing, continued to fire toward the area in which Armando had taken cover. Given the multiple reasonable inferences that the jury could have drawn about Cardenas's intent to kill, it is not clear beyond a reasonable doubt that the jury would have reached the same conclusion on the attempted murder counts in the absence of the kill zone instruction.

19

Both the kill zone instruction itself and the prosecutor's misstatement of the kill zone theory in closing argument further support the finding of prejudice. Both "had the potential to cause confusion regarding the application of the kill zone theory." (*Canizales*, *supra*, 7 Cal.5th at p. 616.) *Canizales* involved the same instruction that was given here—CALCRIM No. 600—and explained why it is problematic. "Beyond its reference to a 'particular zone of harm,' the instruction provided no further definition of the term 'kill zone.' Nor did the instruction direct the jury to consider evidence regarding the circumstances of [Cardenas's] attack when determining whether [he] 'intended to kill [Armando] by killing everyone in the kill zone.'" (*Canizales*, at p. 613.) The instruction therefore created the potential for confusion by allowing the jury to apply the kill zone theory without taking into account the particular circumstances of the attack.

The prosecutor's argument about the kill zone "substantially aggravated the potential for confusion." (*Canizales*, *supra*, 7 Cal.5th at p. 613.) The prosecutor told the jury: "[B]asically if you're shooting into a crowd of people, the people that are in that immediate area, if you're willing to kill them, you're guilty of the attempt murder. So in theory, one bullet can create attempt murder as to multiple people because, depending on where you are—like if you're standing all the way across the parking lot and you're shooting back at a small group of people, trying to hit those one or two people, all those bullets, they put everybody in that cone of danger, that zone of danger. Those people are all victims of attempt murder because your actions show that you're willing to kill them." And then the prosecutor reiterated: "So you shoot at a crowd, you're willing to kill

20

anyone in there, you're in the kill zone. The defendant's responsible for it. That shows his intent to kill you."[9]

As described by the prosecutor, the kill zone theory does not require a primary target. But that is incorrect—without a primary target, the kill zone theory is categorically inapplicable. (*Canizales*, *supra*, 7 Cal.5th at p. 608 ["evidence of a primary target is required"].) Moreover, as presented by the prosecutor, the kill zone theory did not require specific intent to kill anyone. Rather, mere "willing[ness] to kill anyone" (whatever that means) suffices. As in *Canizales*, such a description of the theory "essentially equated attempted murder with implied malice murder." (*Id.* at p. 614.) Consequently, "the prosecutor's argument had the potential to mislead the jury to believe that the mere presence of a purported victim in an area in which he or she could be fatally shot is sufficient for attempted murder liability under the kill zone theory." (*Ibid.*)

The prosecutor's legally erroneous argument was particularly prejudicial because the prosecutor relied almost exclusively on the kill zone theory in support of the attempted murder counts. The prosecutor never argued that there was any evidence that Cardenas shot Chris and Juan because he specifically intended to kill them. Apart from the kill zone theory, the only other theory offered by the prosecutor was that Cardenas aided and abetted Luis.

---

**9**     The prosecutor's description of the kill zone theory is similar to the prosecutor's description in *Canizales*. There, "[t]he prosecutor told the jury that under the kill zone theory, when a defendant is 'shooting at someone and people are within the zone that they can get killed, then [the defendant] is responsible for attempted murder as to the people who are within the zone of fire.'" (*Canizales*, *supra*, 7 Cal.5th at pp. 613-614.)

The People argue that any error was harmless beyond a reasonable doubt, but they do not explain how the analysis of the issue here should differ from the analysis in *Canizales* despite the apparent similarities.  The People also fail to discuss the prosecutor's closing argument.

Given "the potential for confusion created by the attempted murder instruction in combination with the prosecutor's argument" and the lack of overwhelming evidence that Cardenas specifically intended to kill Chris and Juan (*Canizales*, *supra*, 7 Cal.5th at p. 617), we conclude that it is not clear beyond a reasonable doubt that a reasonable jury would have returned the same verdict on the two attempted murder counts absent the instructional error.[10]

---

[10]    The dissent does not disagree with our conclusion that it was error to instruct the jury on the kill zone theory.  But the dissent concludes that the error was harmless because (1) the record contains substantial evidence that Cardenas intended to kill Chris and Juan (dis. opn. *post*, at p. 4), and (2) the findings that the attempted murders were willful, deliberate, and premeditated are "inconsistent with the conclusion that the jury relied upon the kill zone theory" (*id.* at p. 6).  Neither argument has merit.  In *Canizales*, the Supreme Court concluded that instructing the jury on the kill zone theory was prejudicial error even though the record contained substantial evidence that the defendant specifically intended to kill the attempted murder victim.  (*Canizales*, *supra*, 7 Cal.5th at pp. 616-618.)  And a defendant can willfully, deliberately, and with premeditation try to kill a primary target by killing everyone in the area in which the primary target is located—there is no inconsistency between the kill zone theory and willfulness, deliberation, and premeditation.  In addition, the dissent contains several other errors that appear to play important roles in the dissent's reasoning.  For example, we do not "agree[] that all three victims were in a kill zone" (dis. opn., *post*, at p. 2), Cardenas did not testify that he "specifically intended to kill each member of Armando's group" (dis. opn., *post*, at p. 3), and we do not take issue with the statement that, in conducting harmless error analysis under *Chapman*, "the reviewing court must determine beyond a reasonable doubt that a reasonable jury would have rendered the same verdict absent the error" (dis. opn., *post*, at p. 5 & fn. 2).

22

B. *Sufficiency of the Evidence of Specific Intent to Kill*

Cardenas further contends that the attempted murder convictions were not supported by substantial evidence that he specifically intended to kill either Juan or Chris. As we mentioned in our prejudice analysis concerning the kill zone instruction, we disagree.

"The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill.'" (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690; *Smith*, *supra*, 37 Cal.4th at p. 742.) Even if "the shooter merely perceiv[es] the victim as 'a momentary obstacle or annoyance,' the shooter's purposeful 'use of a lethal weapon with lethal force' against the victim, if otherwise legally unexcused, will itself give rise to an inference of intent to kill."[11] (*Smith*, at p. 742.)

Applying those principles, and viewing the evidence in the light most favorable to the judgment and "presuming the existence of every fact the jury could reasonably deduce from the evidence in support of the judgment" (*Smith*, *supra*, 37 Cal.4th at p. 742), we conclude that there was sufficient evidence that Cardenas specifically intended to kill Chris and Juan. Cardenas pointed a gun in the direction of both men and

---

[11]    In reviewing a sufficiency of the evidence claim, our role is limited. We review the entire record to determine whether it discloses reasonable and credible evidence to allow a rational trier of fact to determine guilt beyond a reasonable doubt. (*Smith*, *supra*, 37 Cal.4th at pp. 738-739.) We draw all reasonable inferences in favor of the judgment. (*Id.* at p. 739.) Matters of credibility of witnesses and the weight of the evidence are "'"the exclusive province'"'" of the trier of fact. (*Ibid.*)

fired multiple shots in their direction. Aside from Armando, Juan was the only other person from the group who was in Cardenas's direct line of fire during the first second. Cardenas pointed a gun in Juan's direction and fired. The jury could reasonably infer from that evidence that Cardenas specifically intended to kill Juan.

The evidence of specific intent to kill was stronger as to Chris. Chris was standing close to Armando throughout the verbal confrontation, until he saw Cardenas's gun. Chris advanced toward Cardenas along with Armando and Jesse. While Cardenas provided conflicting evidence about whom he was targeting, Cardenas at one point said that he was targeting the people who were coming toward him, which would have included Chris. From this evidence, the jury could have drawn a reasonable inference that Cardenas specifically intended to kill Chris.

We reject Cardenas's arguments that there was not sufficient evidence of his specific intent to kill either man because he did not know them, did not exchange words with either of them, and "wasn't looking for a fight or intending to shoot anyone that night," and because the bullets struck the men in their feet or ankles. One can specifically intend to kill a stranger. Cardenas was carrying a loaded semiautomatic weapon that he placed in his waistband just before encountering Armando's group. During a verbal confrontation that had not escalated into any physical violence, Cardenas pulled out that weapon and fired in the direction of Armando, Juan, and Chris. No one in Armando's group had a visible weapon. The jury could reasonably infer that Cardenas intended to shoot to kill.

24

That the bullets struck Chris and Juan in their feet and ankles similarly does not show that there was insufficient evidence of specific intent to kill them. One reasonable inference that could be drawn from that evidence, as Cardenas does, is that Cardenas shot both men with the intent to injure or to frighten and not the intent to kill. However, another reasonable inference that could be drawn from that evidence is that Cardenas intended to shoot to kill both Chris and Juan but had poor aim. (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945 ["Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind"].)

Viewing the evidence in the light most favorable to the judgment, we therefore conclude that there was sufficient evidence from which the jury could have concluded that Armando specifically intended to kill both Chris and Juan. Because we conclude that there was sufficient evidence to support the attempted murder convictions, we vacate the two attempted murder convictions and remand to allow the prosecutor to retry Cardenas on those counts.[12]

C. *Sufficiency of the Evidence of Premeditation and Deliberation*

Cardenas also contends that there was not sufficient evidence to support the jury's findings of premeditation and deliberation for either attempted murder count. We agree as to Juan but disagree as to Chris.

---

[12] Because we vacate the attempted murder convictions, we do not address Cardenas's argument that the attempted murder instruction contained confusing language unrelated to the kill zone theory.

An attempted murder is premeditated and deliberate if it occurs ""as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'"" (*People v. Burney* (2009) 47 Cal.4th 203, 235; *People v. Jurado* (2006) 38 Cal.4th 72, 118 (*Jurado*).) "'In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action."'" (*Jurado*, *supra*, at p. 118.) "The process of premeditation and deliberation does not require any extended period of time." (*People v. Mayfield* (1997) 14 Cal.4th 668, 767, overruled on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2; *People v. Lenart* (2004) 32 Cal.4th 1107, 1127 ["We have never required that there be an extensive time to premeditate and deliberate"].) "A reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.'" (*Jurado*, at pp. 118-119; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)

Cardenas argues that the attempted murders of Chris and Juan "were but a random attack," with no "evidence of prior planning activity or motive to kill." Although Cardenas concedes that his act of arming himself evinces preparation, he claims "there was no evidence [he] went to [the restaurant] to instigate trouble or that he or Luis specifically armed themselves that night in anticipation of doing so." Regardless of how

Cardenas justified arming himself, the act of taking a loaded weapon with him to the restaurant is evidence of preparation and planning for involvement in a violent encounter. (*People v. Salazar* (2016) 63 Cal.4th 214, 245 [the "defendant brought a loaded gun with him to the [restaurant], demonstrating preparation"]; *People v. Lee* (2011) 51 Cal.4th 620, 636 [the "defendant brought a loaded handgun with him on the night [the victim] was killed, indicating [the defendant] had considered the possibility of a violent encounter"]; *People v. Romero* (2008) 44 Cal.4th 386, 401 [evidence of planning could be inferred from the fact that the defendant "brought a gun to the video store where, without any warning or apparent awareness of the impending attack, [the victim] was shot in the back of the head"].)

With respect to Chris, there also was evidence of motive to kill, and the manner of the shooting supports a finding of premeditation and deliberation. Although Chris and Cardenas do not appear to have exchanged any words (and both said that they did not), Chris was standing close to Armando during the verbal confrontation until he moved away upon seeing the guns, and he also was one of the three men who initially advanced toward Cardenas during that confrontation. Cardenas confirmed that he was shooting at the "people who were coming toward him." A reasonable jury could infer from that evidence that Cardenas had a motive to kill Chris because he perceived Chris as one of the main aggressors from Armando's group. Moreover, Cardenas shot five bullets into the group of men with whom Chris sought cover after Cardenas shot Armando directly from point blank range. This demonstrates consideration and reflection (however

momentary) before Cardenas fired into the group of men that included Chris. From this evidence along with the evidence of planning and preparation, a jury could reasonably infer that the attempted murder of Chris was the result of thoughtful consideration and not the result of an unconsidered spontaneous act.

We reach a different conclusion as to Juan, however. Although the planning evidence remains the same, there is no evidence of motive, and the manner in which Juan was shot does not support a finding that the attempted murder was the result of premeditation and deliberation. Juan was the last to exit the restaurant and was not involved in the verbal confrontation between the groups. He arrived in the parking lot and emerged from behind the sedan only a few seconds before being struck by one of the first shots fired. He was never standing close to Armando, Chris, or Jesse, nor was he congregating with the larger group of men. Instead, Juan was one car's length behind Armando when the shooting began, and Juan was shot in the first second. There was no evidence that Cardenas had any motive to kill Juan. Moreover, Cardenas shot only two bullets in that first second in which Juan was in the line of fire along with Armando. While this is sufficient evidence to support an intent to kill Juan, viewing this evidence in the light most favorable to the judgment, there is not sufficient evidence from which a jury could conclude that the attempted murder of Juan was the result of thoughtful consideration or any reflection.

For all of these reasons, we conclude that the record contains substantial evidence to support the findings of premeditation and deliberation as to Chris but not as to Juan.

Accordingly, the premeditation and deliberation allegation may be retried on remand as to Chris but not as to Juan.

D.  Arbuckle *Violation and Forfeiture*

Cardenas contends that the matter should be remanded for resentencing because he was denied his right to be sentenced by the same judge who accepted his plea to being a felon in possession of a firearm (count 5), in violation of his rights under *Arbuckle*, *supra*, 22 Cal.3d 749.  The People counter that Cardenas forfeited the contention by failing to raise it below and that he agreed to be sentenced on all counts by another judge and thus expressly waived his *Arbuckle* right.  We agree that Cardenas forfeited the issue by failing to raise it at sentencing.

1.  *Guilty Plea on Count 5 and Sentencing*

The day before jury selection was set to begin for the first trial, Cardenas indicated that he intended to plead guilty to count 5, being a felon in possession of a firearm.  At a hearing before Judge Charles J. Koosed the next day, Cardenas entered his guilty plea to that count, and Judge Koosed accepted it over the People's objection.

The written plea form that Cardenas and his attorney signed did not contain an *Arbuckle* waiver.  After accepting Cardenas's guilty plea, Judge Koosed trailed sentencing until after the conclusion of the trial.  Judge Koosed deferred having Cardenas provide a factual basis for the guilty plea until the time of sentencing.  Neither Judge Koosed nor the People requested that Cardenas waive his right to be sentenced by Judge Koosed.

29

After Cardenas was found guilty of the two attempted murder counts and the assault with a deadly weapon count at the first trial, Cardenas agreed to waive time for being sentenced on count 5 to allow for a new trial on the murder count to be scheduled. Regarding an *Arbuckle* waiver, Judge Koosed said, "I'm not going to take an *Arbuckle* waiver either unless you want me to because I believe just wait and see what happens. [¶] You guys okay with that also?" Neither attorney objected.

Judge Mac R. Fisher presided over the second trial. After the conclusion of that trial, Judge Fisher asked counsel if he (Judge Fisher) was correct in assuming that he would be sentencing Cardenas on all matters, including the "verdicts and, probably, findings" received by Judge Koosed in the first trial. The prosecutor agreed to having Judge Fisher handle the sentencing on all counts. Defense counsel was unsure if that was appropriate. The prosecutor and defense counsel conferred off the record and tentatively agreed that Judge Fisher could sentence Cardenas on all counts with the caveat that they would further research the matter.

Five months later, Judge Fisher sentenced Cardenas on all counts, including count 5. Defense counsel did not object to Judge Fisher's presiding at sentencing. No one mentioned *Arbuckle*, Cardenas's right to be sentenced by the same judge who accepted his guilty plea, or any waiver of that right.

2. *Legal Analysis*

In 1978 in *Arbuckle*, *supra*, 22 Cal.3d 749, our Supreme Court recognized as a "general principle" that an implicit term in every plea bargain is that the sentence will be

30

imposed by the same judge who accepted the plea bargain and retained sentencing discretion under the agreement. (*Id.* at pp. 756-757.) The reason for the rule is that a sentencing judge has discretion to choose among a range of available dispositions. Because of that discretion, "the propensity in sentencing demonstrated by a particular judge is an inherently significant factor in the defendant's decision to enter a guilty plea." (*Id.* at p. 757.)

Recently, in *K.R. v. Superior Court* (2017) 3 Cal.5th 295 (*K.R.*), the Supreme Court affirmed the continuing validity of the rule announced in *Arbuckle*, *supra*, 22 Cal.3d 749: "[W]e adhere to the plain and original understanding of *Arbuckle* that in every plea in both adult and juvenile court, an implied term is that the judge who accepts the plea will be the judge who pronounces sentence." (*K.R.*, *supra*, at p. 312.) *K.R.* disapproved post-*Arbuckle* Court of Appeal cases that had "declined to apply *Arbuckle*'s same-judge rule as a categorical presumption, and instead began examining the trial record for evidence of the parties' actual intent." (*K.R.*, at pp. 307, 309.)

Cardenas's plea agreement did not contain an express waiver of his *Arbuckle* rights. Therefore, under *Arbuckle* and *K.R.*, an implied term of the agreement was that Cardenas would be sentenced on count 5 by the same judge who took his guilty plea to that count.

The People argue, however, that Cardenas forfeited the issue by failing to object to being sentenced by Judge Fisher on count 5. In response, Cardenas cites *Bueno*, *supra*, 32 Cal.App.5th 342 for the proposition that failure to raise the *Arbuckle* issue at

31

sentencing does not result in forfeiture.  We agree with the People and decline to follow *Bueno*.

"[T]he right to challenge a criminal sentence on appeal is not unrestricted.  In order to encourage prompt detection and correction of error, and to reduce the number of unnecessary appellate claims, reviewing courts have *required* parties to raise certain issues at the time of sentencing.  In such cases, lack of a timely and meaningful objection forfeits or waives the claim." (*People v. Scott* (1994) 9 Cal.4th 331, 351.)  Applying that forfeiture doctrine, multiple cases have held that *Arbuckle* claims are forfeited when not raised at sentencing.  (*People v. Adams* (1990) 224 Cal.App.3d 1540, 1544 (*Adams*), disapproved on another ground in *K.R.*, *supra*, 3 Cal.5th at p. 313, fn. 10; *People v. Serrato* (1988) 201 Cal.App.3d 761, 764 (*Serrato*), disapproved on another ground in *K.R.*, at p. 313, fn. 10; *People v. Ruhl* (1985) 168 Cal.App.3d 311, 315 (*Ruhl*), disapproved on another ground in *K.R.*, at p. 313, fn. 10; *People v. West* (1980) 107 Cal.App.3d 987, 992 (*West*).)

Cardenas's contrary argument is based on *Bueno*, which held that failure to object on the basis of *Arbuckle* at sentencing does not forfeit the issue for purposes of appeal. (*Bueno*, *supra*, 32 Cal.App.5th at p. 350.)  *Bueno* derived that conclusion from *K.R.*, but we find *Bueno*'s reasoning and interpretation of *K.R.* unpersuasive.

*K.R.* was a juvenile delinquency case in which the minor raised an *Arbuckle* objection at disposition, but the trial court rejected the claim.  (*K.R.*, *supra*, 3 Cal.5th at p. 303.)  The Court of Appeal too denied relief on the ground that the minor "'failed to

32

show that he entered into the plea agreement in expectation of and reliance upon' having the same judge who took his plea also preside at sentencing." (*Id.* at p. 298.) The Supreme Court reversed, explaining that *Arbuckle* means what it says: "[A] defendant's negotiated plea agreement necessarily include[s] an implied term that the same judge who accepted his plea would preside at sentencing," unless the parties expressly agree to the contrary. (*K.R.*, at pp. 305-306.) The Supreme Court also criticized several prior Court of Appeal cases, which purported to limit *Arbuckle* by finding the same-judge right was included in the plea agreement only if the record contained evidence of "the parties' actual intent" to include such a term, or evidence showing the defendant had "a reasonable expectation he would be sentenced by the same judicial officer who accepted his negotiated plea." (*K.R.*, at p. 307.)

Because the minor in *K.R.* objected on the basis of *Arbuckle* at disposition, the Supreme Court did not discuss whether failure to raise such an objection would result in forfeiture. *Bueno* nonetheless concluded that *K.R.* rejected the forfeiture rule, for the following reasons: In *K.R.*, the People argued that "a pleading defendant (or juvenile) can protect their *Arbuckle* rights by striking an express agreement to have the same judge preside at both change of plea (admissions) and sentencing (disposition)." (*K.R.*, *supra*, 3 Cal.5th at p. 312.) The Supreme Court rejected the argument and observed that "[t]o the extent the People seek to place the burden on a pleading defendant or juvenile to make his or her preferences explicit on pain of forfeiting the right to the same judge at sentencing, the People would turn *Arbuckle* on its head." (*K.R.*, at pp. 312-313.) *Bueno*

33

interpreted the Supreme Court's reasoning as implicitly rejecting all application of forfeiture rules to *Arbuckle* rights, whether at the plea stage or at sentencing: "To hold that *Arbuckle* rights are forfeited if not invoked by the defendant would necessarily undermine the main holding of *K.R.*, in which it reaffirmed that the rights under *Arbuckle* are implied as part of every plea bargain, regardless of the defendant's actions or intentions." (*Bueno*, *supra*, 32 Cal.App.5th at p. 350.)

We disagree. *K.R.*'s holding is that *Arbuckle*'s same-judge right is an implied term of every plea agreement unless expressly excluded. Thus, *if a defendant raises an* Arbuckle *objection at sentencing*, then the objection cannot be defeated by pointing out that the plea agreement did not mention *Arbuckle*, the parties never discussed *Arbuckle*, the defendant did not have a reasonable expectation of being sentenced by the same judge, and so forth. None of that is undermined by holding that *if a defendant does not raise an* Arbuckle *objection at sentencing*, then the issue is forfeited. The *K.R.*/*Arbuckle* rule gives defendants a particular contractual right; the same-judge right is part of every plea agreement (unless it is expressly excluded). The forfeiture rule requires defendants to take timely, appropriate action in order to exercise that contractual right. There is no conflict.

We likewise disagree with *Bueno*'s interpretation of *K.R.*'s disapproval of prior Court of Appeal case law. Because *Bueno* interprets *K.R.* as holding both that the *Arbuckle* same-judge right is an implied term of every plea agreement (unless expressly excluded) and that the right is not forfeited by failure to invoke it at sentencing, *Bueno*

34

interprets *K.R.* as disapproving *Adams*, *Serrato*, and *Ruhl* on both of those points. (*Bueno*, *supra*, 32 Cal.App.5th at pp. 348-349.)

We believe that interpretation is incorrect. *K.R.* disapproved all three cases "[t]o the extent [they] are inconsistent with this opinion" and did not expressly identify the point of law on which they were disapproved. (*K.R.*, *supra*, 3 Cal.5th at p. 313, fn. 10.) But *K.R.* did cite specific pages of each case, and in each instance the citation is to the holding that the *Arbuckle* right is not an implied term of every plea agreement. (*Ibid.*, citing *Adams*, *supra*, 224 Cal.App.3d at p. 1543, *Serrato*, *supra*, 201 Cal.App.3d at p. 764, & *Ruhl*, *supra*, 168 Cal.App.3d at p. 315.) In no instance is the citation to the holding that the *Arbuckle* right is forfeited if not raised at sentencing. Moreover, *K.R.* also disapproved *People v. Horn* (1989) 213 Cal.App.3d 701 (*Horn*), which rejected application of the forfeiture rule to *Arbuckle* claims. (*K.R.*, at p. 313, fn. 10; *Horn*, *supra*, at p. 709.) Again, *K.R.* cited the holding that the *Arbuckle* right is not an implied term of every plea agreement; it did not cite the holding concerning forfeiture. (*K.R.*, at p. 313, fn. 10, citing *Horn*, at pp. 707-708.) And *K.R.* did not disapprove *West*, *supra*, 107 Cal.App.3d 987, which did not hold that the *Arbuckle* right is not an implied term of every plea agreement but did hold that the *Arbuckle* right is forfeited if not raised at sentencing. (*West*, at p. 992.) For all of these reasons, we disagree with *Bueno*'s conclusion that *K.R.* disapproved prior Court of Appeal case law on the issue of forfeiture at sentencing.

In sum, we do not find *Bueno* persuasive, and we see no other reason to decline to apply the forfeiture rule here. We therefore conclude that because Cardenas did not object on the basis of *Arbuckle* at sentencing, he forfeited the issue.

E. *Abstract of Judgment*

Cardenas contends that the abstract of judgment should be amended to correctly reflect the dates of conviction. The People concur, and we agree. We have the inherent authority to correct an abstract of judgment that does not accurately reflect the oral judgment of the trial court. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

The abstract of judgment provides that Cardenas was convicted on January 29, 2018, for all counts. However, that is the date of conviction for count 1 (second degree murder) only. The correct conviction date for count 4 (assault with a deadly weapon) is April 3, 2017, and the correct conviction date for count 5 (being a felon in possession of a firearm) is March 21, 2017, when Cardenas pled guilty to that count. The abstract of judgment should be amended accordingly.[13]

## DISPOSITION

We vacate the two attempted murder convictions (counts 2 & 3), reverse the finding of premeditation and deliberation with respect to the attempted murder conviction as to Juan (count 3), and remand for further proceedings consistent with this opinion. The trial court is directed to (1) prepare an amended abstract of judgment reflecting that

---

[13] Because we vacate the attempted murder convictions, the argument concerning clerical errors with respect to those convictions is moot.

36

the date of conviction for the assault with a deadly weapon (count 4) is April 3, 2017, and the date of conviction for the felon in possession of a firearm (count 5) is March 21, 2017, and (2) forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

CERTIFIED FOR PUBLICATION

MENETREZ

J.

I concur:

SLOUGH

J.

[*People v. Cardenas,* E070624]

RAMIREZ, P. J., Dissenting.

I write separately to express disagreement with the majority's analysis and conclusion on the kill-zone instruction.  There is a serious logic gap between the majority's analysis of the kill zone theory and its conclusion that there is sufficient evidence to support the finding of specific intent to kill the attempted murder victims, giving rise to an internally contradictory result.[1]

As the majority correctly notes, in *Canizales,* the Supreme Court held, "[T]he kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes:  (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target; and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm.  Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*People v. Canizales* (2019) 7 Cal.5th 591, 607.)

---

[1] I concur with the majority's discussion and result on the *Arbuckle* issue. (*People v. Arbuckle* (1978) 22 Cal.3d.749.)

1

But from there, the majority reaches an errant conclusion that the kill-zone instruction infected the jury's verdict. This is wrong for several reasons.

First, in assessing the impropriety of the "kill-zone" instruction, the majority states that Armando was Cardenas's primary target and that during this first phase of the attack there was insufficient evidence Cardenas intended to create a kill zone in order to kill Armando. (Maj. opn., pp. 14-15.) The majority goes on to discuss the "second phase" of the attack in which defendant was seen to retreat on the video, taking defendant farther from the group, and concludes, "we do not see how a jury could reasonably infer that Cardenas specifically intended to kill everyone around Armando as a means of killing Armando." (Maj. opn., p. 16)

Yet later, the majority finds sufficient evidence of specific intent to kill Chris and Juan because "Cardenas pulled out that weapon and fired in the direction of Armando, Juan, and Chris. No one in Armando's group had a visible weapon. The jury could reasonably infer that Cardenas intended to shoot to kill." (Maj. opn. p. 24.) Seemingly, the majority agrees that all three victims were in a kill zone.

But the jury did not need to infer anything. Defendant's own testimony showed that Armando was not the only target. He admitted on the stand that he intentionally shot at other "targets," members of Armando's group, as they were running for cover. He did not know if they were coming after him, so he shot at everyone who was running. In other words, the jury did not have to rely on the kill zone as an alternative theory, or infer that defendant intended to shoot others as a means of killing Armando because the

2

defendant personally admitted he attempted to kill all the members of Armando's group, though he was only successful in killing Armando.

At a minimum, the two gunmen created a kill zone where Armando was but one of several targets. And according to defendant's own testimony, Cardenas specifically intended to kill each member of Armando's group because he thought they were coming after him, even as they ran for cover. We do not need to resort to inference to determine whether the defendant intended to kill everyone within the "kill zone" because he provided direct evidence of that intent when he testified he was shooting at everyone in the group, even as they ducked for cover under a hail of bullets.

The majority is correct in pointing out that the kill zone instruction, as an alternative theory of attempted murder liability, is properly given "only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm." (*People v. Canizales, supra,* 7 Cal.5th at p. 608.) But, again, we do not need to rely on an "inference" because we have defendant's own admission that he intended to kill everyone in that zone.

Second, and inexplicably, the majority concludes "that there was sufficient evidence that Cardenas specifically intended to kill Chris and Juan," relying on *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690, and *People v. Smith* (2005) 37 Cal.4th 733, 742. "'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.]"

3

(*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)  By concluding defendant harbored the requisite intent to kill Chris and Juan, the majority has actually established the attempted murder verdicts were not based on reliance on any alternative theory, thereby undermining any conclusion that the jury must have improperly relied on the kill-zone theory in convicting on those counts.

*Chinchilla* is cited for the proposition that "[t]he act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . .' [Citation.]" (*Chinchilla, supra,* 52 Cal.App.4th at p. 690.)  The majority then states that from this evidence, the jury could have drawn a reasonable inference that Cardenas specifically intended to kill Chris and Juan.  (Maj. opn., pp. 22-23.)

*Smith* is cited for the proposition that even if "the shooter merely perceiv[es] the victim as 'a momentary obstacle or annoyance,' the shooter's purposeful 'use of a lethal weapon with lethal force' against the victim, if otherwise legally unexcused, will itself give rise to an inference of intent to kill." (*Smith, supra,* 37 Cal.4th at p. 742.) Specifically, the majority finds "Cardenas pointed a gun in the direction of both men and fired multiple shots in their direction" (maj. opn., pp. 23-24), as evidence defendant had the requisite specific intent to kill.

By finding substantial evidence of specific intent to kill Chris and Juan, the majority demonstrates that the convictions were not marred by reliance on a faulty legal theory.  Cardenas specifically intended to kill Chris and Juan and acted on that intention,

thus committing attempted murders of the two victims. This also shows the majority erroneously assessed prejudice in instructing the jury on the kill zone theory.

Alternative-theory instructional error is subject to the *Chapman* harmless error test. (*People v. Aledamat* (2019) 8 Cal.5th 1, 13, referring to *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) "The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat, supra*, 8 Cal.5th at p. 13.) It is enough if we can say, beyond a reasonable doubt, the legally inadequate theory did not contribute to the verdict. (*Id.* at pp. 10, 12.) In other words, the reviewing court must determine beyond a reasonable doubt that a reasonable jury would have rendered the same verdict absent the error. (*Canizales, supra*, 7 Cal.5th at p. 615.)[2]

---

[2] The majority takes issue with this statement and argues that under the holding of *Canizales*, the Supreme Court concluded that instructing the jury on the kill zone theory was prejudicial error even though the record contained substantial evidence that the defendant specifically intended to kill the attempted murder victim. (*Canizales, supra*, 7 Cal.5th at pp. 616-618.) (Maj.opn., p. 22, fn. 10.) Not so. The Supreme Court in *Canizales* concluded it was *not* clear, beyond a reasonable doubt, that a jury would have come to the conclusion that defendant intended to kill Bolden specifically, in finding the kill zone alternate theory instruction prejudicial. (*Canizales, supra*, 7 Cal.5th at p. 616.) And therein lies the problem. Here, the majority itself found there was evidence of specific intent to kill all three victims, and, as I have demonstrated, the jury made factual findings demonstrating they did not rely on the kill zone theory in finding defendant guilty of the attempted murder counts. Thus, any error in instructing the jury on the alternate theory was necessarily harmless beyond a reasonable doubt.

Here, the jury would have—and, I submit, it did—rendered the same verdict without reliance on the alternative kill-zone instruction. The majority apparently agrees there was substantial evidence that defendant specifically intended to kill the two attempted murder victims. In addition, the totality of the evidence does not support a theory that the defendant targeted Armando alone; instead, he targeted Armando's companions as well. By his own admission, defendant fired directly at all the victims because he thought they might be armed, which establishes beyond a reasonable doubt that defendant specifically intended to kill them all and committed an act that went beyond mere preparation towards completion of the crime of murder by firing at the victims with the requisite intent to kill. These facts demonstrate that a reasonable jury would have rendered the same verdict absent the error. (*Canizales*, *supra*, 7 Cal.5th at p. 615.) But there's more.

The jury also found the attempted murders were willful, deliberate, and premeditated. Such a finding is inconsistent with the conclusion that the jury relied upon the kill zone theory, striking Chris and Juan while targeting Armando, although it is consistent with the defendant's testimony that he was shooting to kill everyone in the group. (See *People v. Wharton* (1991) 53 Cal.3d 522, 572 [no prejudice in instructional error where jury's finding that defendant premeditated and deliberated the killing was "manifestly inconsistent with having acted under the heat of passion"]; see also, *People v. Franklin* (2018) 21 Cal.App.5th 881, 894 ["the jury's finding of premeditation and deliberation is 'manifestly inconsistent with having acted under the heat of passion' and

6

nullifies any potential for prejudice"]; *People v Peau* (2015) 236 Cal.App.4th 823, 831-832.)

The finding that the attempted murders were premeditated and deliberate is consistent only with the conclusion that the attempted murders were not grounded on a kill-zone theory that defendant intended only to kill Armando when he shot at others. The defendant admitted he intentionally shot at all the victims, not just Armando. A finding of premeditation/deliberation, which could only be based on defendant's testimony that he actually aimed at Chris and Juan, shows the kill zone instruction did not contribute to the verdict.

A sister court recently reached a similar conclusion under almost identical circumstances. There, the defendant exited a vehicle and approached a group of young men sitting on some bleachers. The defendant asked the young men where they were "from," effectively asking them the name of their gang. One young man in the group replied they were not gang members. The defendant pulled out a gun, said "Culver City," and shot that young man multiple times. That victim grabbed his stomach and fell, dying from his wounds. The defendant then pointed the gun toward the four men who had been on the top row of the bleachers, who tried to run, and shot two of the men twice. (*People v. Mariscal* (2020) 47 Cal.App.5th 129, 133.)

In that case, the reviewing court concluded that, "with respect to attempted murder, the jury was instructed on both direct intent to kill and kill zone. The error in giving the kill zone instruction was harmless beyond a reasonable doubt because the

7

undisputed evidence is that defendant intended to kill all five young men." (*People v. Mariscal*, *supra*, 47 Cal.App.5th at pp. 139-140.)

The facts of the instant case are eerily similar to *Mariscal* where Cardenas, after asking the group of approaching victims, "What's up," and "What's up? This is Spanky" began firing at point blank range at Armando, and then directing his fire—as did Luis—at the other members of the group as they tried to take cover. Opening fire on persons in an opening between parked cars was like shooting fish in a barrel, and defendant candidly admitted he aimed at them all, even as they ran for cover. Any instructional error was harmless beyond a reasonable doubt.

I would affirm the judgment.

RAMIREZ              
P. J.
